Case No. 22-13958

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

### MIKE BORDELON., et al.,

*Plaintiffs-Appellees,*

**v.**

### BALDWIN COUNTY, et al.,

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Southern District of Alabama, Southern Division

*District Court Case No. 1:20-CV-00057-C*

---

## BRIEF OF APPELLEES MIKE BORDELON AND
## BREEZY SHORES, LLC

---

**Kristopher O. Anderson**
**John Parker Yates**
Yates Anderson
4851 Wharf Parkway, Suite D-230
Orange Beach, AL 36561
(251) 500-4853
kris@yatesanderson.com
parker@yatesanderson.com

**Jonathan M. Houghton**
**Kathryn D. Valois**
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
(202) 888-6881
JHoughton@pacificlegal.org
KValois@pacificlegal.org

*Attorneys for Appellees Mike Bordelon and Breezy Shores, LLC*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Appellees, Mike Bordelon and Breezy Shores, LLC, hereby respectfully submit this Certificate of Interested Persons and Corporate Disclosure Statement in accordance with 11th Cir. R. 26.1-2, and list the following entities/persons as parties in the above-styled proceeding:

1.    Anderson, Kristopher O. – Attorney for Plaintiffs/Appellees;

2.    Bordelon, Mike – Plaintiff/Appellee;

3.    Breezy Shores, LLC – Plaintiff-Appellee;

4.    Baldwin County, Alabama – Defendant/Appellant;

5.    Baldwin County Commission District 4 Planning and Zoning Board of Adjustment – Defendant;

6.    Brown, Matthew (*in his official capacity*) – Appellant;

7.    Hon. William E. Cassady – Judge in District Court;

8.    Frawley, Jamie Helen Kidd – Attorney for Defendants/Appellants;

9.    Jackson, Vince (*in his individual capacity*) – Defendant;

10.   Lyckman, Haley – Former Counsel for Defendants;

11.   Yates, John Parker – Attorney for Plaintiffs/Appellees;

12.   Webb McNeill Walker, P.C. – Firm representing Defendants/Appellants; and

13.   Yates Anderson, LLC –Firm representing Plaintiffs/Appellees.

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

COMES NOW, Mike Bordelon and Breezy Shores, LLC, and in accordance with the Order of this Court and Federal Rules of Appellate Procedure, make the following disclosure concerning parent companies, subsidiaries, partners, limited liability entity members and managers, trustees (but no trust beneficiaries), affiliates, or similar reportable entities:

| <u>Reportable Entity</u> | <u>Relationship to Party</u> |
|---|---|
| MRBIRA, LLC | Member of Breezy Shores, LLC |
| DLP 1 LLC | Member of Breezy Shores, LLC |
| Mike Bordelon | Member of MRBIRA, LLC |
| Madison Trust Company, Trustee of the Mike Bordelon self-directed IRA Trust Fund | Member of MRBIRA, LLC |
| Tom Lynch | Member of DLP I LLC |
| Mark Bardi | Member of DLP I LLC |

ii

## STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully request oral argument in this case considering the important issues of vested rights under Alabama law and temporary takings under the Fifth Amendment to the United States Constitution.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .........................................................i

CORPORATE DISCLOSURE STATEMENT ........................................................ii

STATEMENT REGARDING ORAL ARGUMENT ...........................................iii

TABLE OF CONTENTS..........................................................................................iv

TABLE OF CITATIONS ........................................................................................vi

STATEMENT OF JURISDICTION......................................................................1

STATEMENT OF THE ISSUES ...........................................................................2

STATEMENT OF THE CASE................................................................................3

I.       Course of Proceedings and Dispositions Below..........................................3

II.      Facts Relevant to the Issues Presented for Review .....................................4

         A. The Site, Permitting, and Commencement of Construction .....................4

         B. Revocation of the Land Use Certificate and Stop Work Order ................7

         C. "Stacked Parking" and the Parking Ordinance ..........................................10

         D. The Revised Incidental Take Permit and Story
            Ordinance Development ...........................................................................20

         E. Compensation for Baldwin County's Temporary Taking .........................25

III.     Standard of Review.........................................................................................27

SUMMARY OF THE ARGUMENT.....................................................................27

iv

ARGUMENT ..................................................................................28

I.    Breezy Shores had a Vested Right Under the Land Use Certificate and Building Permit..............................................................................28

II.   The Revocation of the Vested Land Use Certificate was a Regulatory Taking ..............................................................................33

    A. The Taking of the Land Use Certificate was a Final Determination ........33

    B. The Revocation of the LUC was a *Penn Central* Taking .........................34

        1. The Character of the Regulatory Action by Itself Affirms the Lower Court's Determination ..................................................................36

        2. The Destruction of Reasonable Investment Backed Expectations Confirms a Regulatory Taking ..........................................................43

        3. The Economic Impact Affirms a Regulatory Taking ..........................46

III.  The Compensation Awarded was Supported by the Evidence....................48

    A. Lost income and increased construction costs are compensable ..............48

IV.   Mike Bordelon has Individual Standing.......................................................55

CONCLUSION ..............................................................................57

CERTIFICATE OF COMPLIANCE ..................................................58

CERTIFICATE OF SERVICE..........................................................58

# TABLE OF AUTHORITIES

## Cases

*120 Delaware Ave., LLC v. U.S.*, 95 Fed.Cl. 627 (2010) .........................................50

*AA Profiles, Inc. v. City of Fort Lauderdale*,
  253 F.3d 576 (11th Cir. 2001) .................................................................48,49,51

*Atomic Fuel Extraction Corp. v. Slick's Estate*,
  86 S.W.2d 180 (Tex. Civ. App. San Antonio 1964)..........................................50

*Arkansas Game & Fish Com'n v. U.S.*, 568 U.S. 23 (2012)....................................35

*Babbitt v. Youpee*, 519 U.S. 234 (1997) .................................................................38

*Board of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972) .........................29

*Board of Zoning Adjustment for City of Lanett v. Boykin*,
  92 So. 2d 906 (Ala. 1957)........................................................................................31

*Breland v. City of Fairhope*, 337 So.3d 741 (Ala. 2020) ...................................31,32

*CCA Associates v. U.S.*, 91 Fed. Cl. 580 (2010)......................................................37

*Cienega Gardens v. U.S.*, 331 F.3d 1319 (Fed. Cir. 2003)...........................37,43,56

*City of Austin v. Teague*, 570 S.W.2d 389 (Tex. 1978)......................................49,50

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ........................................35,45,47

*FBO David Sweet IRA v. Taylor*, 4 F. Supp. 3d 1282 (M.D. Ala. 2014) ...............56

*Grayson v. City of Birmingham*, 277 Ala. 522, 173 So. 2d 67 (1963) ...................29

*Hodel v. Irving*, 481 U.S. 704 (1987) .....................................................................38

*Kimball Laundry Co. v. U.S.*, 338 U.S. 1, 7,
   69 S. Ct. 1434, 93 L. Ed. 1765 (1949)............................................................52,53

*Lingle v. Chevron U.S.A, Inc.*, 544 U.S. 528 (2005) ......................................36,37,38

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) .........................43

*Marine One, Inc. v. Manatee County*, 877 F.2d 892 (11th Cir. 1989) ...................29

*Mason and Dixon Lines, Inc. v. Byrd*, 601 So.2d 68 (Ala. 1992)...........................49

*Morgan v. South Cent. Bell Telephone Co.*, 466 So.2d 107 (Ala. 1985) ...............49

*Nemmers v. City of Dubuque*, 764 F.2d 502 (8th Cir.1985)...............................51,52

*Pakdel v. City and County of San Francisco, California*,
   141 S.Ct. 2226 (2021)............................................................................34

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)................................................35,43

*Penn Cent. Transp. Co. v. City of New York*,
   438 U.S. 104 (1978)..................................................................................passim

*Pettro v. U.S.*, 47 Fed. Cl. 136 (2000) ....................................................................53

*Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998) ...........................28

*Primetime Hospitality, Inc. v. City of Albuquerque*,
   146 N.M. 1 (N.M. 2009)...................................................................................50

*Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208 (11th Cir. 1995) ....................29

*South Grande View Development Co., Inc. v. City of Alabaster, Alabama*,
   1 F.4th 1299 (11th Cir. 2021) ..................................................................37,45,48

*Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097 (Tex. 1938).........................49

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002)..............................................................................35

*Tokyo Gwinnett, LLC v. Gwinnet County, Georgia*,
  940 F. 3d 1254 (11th Cir. 2019) ..........................................................55

*United States v. 9.20 Acres of Land*, 638 F.2d 1123 (8th Cir. 1981) ....................49

*United States v. 37.15 Acres of Land*, 77 F.Supp. 798 (D. Cal. 1948)....................52

*United States v. An Easement and Right-of-Way Over 6.09*
  *Acres of Land, More or Less, in Madison County, Alabama,*
  140 F.Supp.3d 1218 (N.D. Ala. 2015)...............................................55

*United States v. General Motors Corporation*, 323 U.S. 373 (1945)....................52

*United States v. Miller*, 317 U.S. 369 (1943) ..........................................48

*United States v. Musselwhite*, 709 Fed.Appx. 958 (11th Cir. 2017) ......................55

*Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427 (11th Cir. 1998)...................45

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980)...................29

*Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir. 1981) ...........................46

*Wheeler v. City of Pleasant Grove*, 746 F.2d 1437 (11th Cir. 1984) ......................46

*Wheeler v. City of Pleasant Grove*, 833 F.2d 267 (11th Cir. 1987) ................passim

*Wheeler v. City of Pleasant Grove*, 896 F.2d 1347 (11th Cir. 1990) ......................46

*Yuba Natural Resources, Inc. v. U.S.*, 904 F.2d 1577 (Fed. Cir. 1990) .................50

**<u>Secondary Sources</u>**

26 Am. Jur. Proof of Facts 3d 119 (Originally published in 1994) ........................49

*Calculating Compensation for Temporary Regulatory Takings*,
   42 Kan. L.Rev. 201 (1993) ...............................................................................50

*Dobbs Law of Remedies* § 6.9(2), at 182 (2d ed. 1993).....................................52,53

*Recognizing Vested Development Rights as Protected Property in Fifth
   Amendment Due Process and Takings Claims*,
   49 Wash. U. J. Urb. & Contemp. L. 27 (1996)..................................................29

## <u>STATEMENT OF JURISDICTION</u>

Appellees hereby adopt the statement of jurisdiction set forth in Appellants'

opening brief (Doc. 11, p. 14).

## <u>STATEMENT OF THE ISSUES</u>

Appellees hereby adopt the statement of issues set forth in Appellants' opening brief (Doc. 11, pp. 15-16).

## STATEMENT OF THE CASE

## I.    COURSE OF THE PROCEEDINGS AND DISPOSITIONS BELOW

1.    Breezy Shores filed its Notice of Appeal in the Circuit Court of Baldwin County, Alabama on December 16, 2021. (Doc. 1-1).

2.    Mike Bordelon and Breezy Shores then filed their First Amended Complaint on January 8, 2020. (Appendix Vol. I, p. 38)

3.    Appellants removed this case to the District Court on February 3, 2020. (Appendix Vol. I, p. 20).

4.    Bordelon and Breezy Shores filed their Second Amended Complaint on July 1, 2020. (Appendix Vol. I, p. 63).

5.    Both parties filed motions for summary judgment. (Docs. 44-48, 51-55).

6.    The district court denied Plaintiffs' Motion for Summary Judgment and granted Defendants' Motion in part.

7.    At trial, the court heard Plaintiffs' claims for an administrative appeal (Count One), a takings claim against Baldwin County and Jackson in his official capacity (Count Six), a state law vested rights claim (Count Seven), and negligence/wantonness (Count Nine). The Court found in favor of Plaintiffs on Count One, Count Six, and Count Seven, but found in favor of Defendants on Count

3

Nine on the basis of substantive immunity. (Appendix Vol. III at p. 1593).

## II.    FACTS RELEVANT TO THE ISSUES PRESENTED FOR REVIEW

### A.    The Site, Permitting, and Commencement of Construction

8.      On or about February 6, 2018, Breezy Shores, LLC, purchased a lot on the Gulf of Mexico in the Fort Morgan area of Gulf Shores, Alabama, with plans to develop a duplex at that location (the "Site"). (Appendix Vol. I at p. 573).

9.      Mike Bordelon is the beneficiary and trustee of a self-directed IRA that owns 50% of Breezy Shores, LLC. (Appendix Vol. 1 at p. 571; p. 685). Bordelon has been the individual primarily responsible for managing the development of Breezy Shores project. (Appendix Vol. 1 at p. 572). He has also been personally responsible for legal costs in relation to the project, both before and after litigation was instituted. (Appendix Vol. I at 685).

10.      Development of real property in Fort Morgan is governed by the Baldwin County Commission, and zoning matters are governed by the Baldwin County Zoning Ordinance. (Appendix Vol. I at p. 967). Different areas of Baldwin County fall within different Planning Districts, with Fort Morgan and the Site lying within Planning District 25. (Appendix Vol. I at p. 1015).

11.      A residential development in Baldwin County generally requires at least two permits: first, a land use certificate from the Baldwin County Planning and

4

Zoning Department (the "Zoning Department"), and second, a building permit from the Baldwin County Building Department (the "Building Department"). (Appendix Vol. I at p. 511)

12.     In accordance with Section 18.2.1 of the Baldwin County Zoning Ordinance (the "Ordinance"), this two-step process gives the Zoning Administrator an opportunity to inspect the property and the application to ensure compliance with the Ordinance prior to allowing the commencement of development of the property and thereby preventing any unnecessary expenses. By the terms of the Ordinance, a land use certificate is valid for issuance of a building permit for up to 180 days after issuance. *See id.*, (Appendix Vol. I at p. 1174, § 18.2.4).

13.     Plaintiffs submitted their original site plans and land use certificate application to the Baldwin County Planning Director, Vince Jackson (Appendix Vol. I at p. 293), and the Zoning Department on March 19, 2019 (Appendix Vol. I at p. 731; Appendix Vol. I at p. 511). The site plan and application were reviewed and then accepted on March 27, 2019. (Appendix Vol. I at p. 731; Appendix Vol. I at p. 255); (*id.*, Appendix Vol. I at p. 300; Appendix Vol. I at p. 579).

14.     In doing so, Breezy Shores adhered to the above-delineated published procedures in the Ordinance.

15.     Breezy Shores had to revise its site plan to add the additional parking

5

spaces. (*See, e.g.*, Appendix Vol. I at p. 281-83; Appendix Vol. I at p. 581)

16.    On July 17, 2019, Breezy Shores received its approved land use certificate (the "LUC") for its duplex project. (Appendix Vol. I at p. 732; Appendix Vol. I at p. 240; Appendix Vol. I at p. 516). Less than a week later, on July 23, 2019, the Building Department issued Building Permit #126349 for the Site based upon Breezy Shores' architectural and engineering plans and the existing LUC. (Appendix Vol. I at p. 730; Appendix Vol. I at p. 582).

17.    After receiving the Building Permit, Breezy Shores immediately moved forward with development of the Site per the authorized plans. (Appendix Vol. I at p. 516-17 (builder's testimony that construction on the project began shortly after receipt of the building permit on July 23, 2019)); (Appendix Vol. I at p. 305 (Jackson agreed that Breezy Shores did nothing wrong in starting to build its duplex, specifically by putting pilings in the ground)).

18.    Breezy Shores, through the builder, expended monies on building materials (principally pilings and windows) and labor, including that Jones' "piling guy got down there and . . . started installing pilings." (Appendix Vol. I at p. 518; *but cf. id.*, 537-38 (Jones' testimony that if none of the costs listed on Trial Exhibit 53 were incurred between July 23, 2019 and July 31, 2019, they were not then incurred); (Appendix Vol. I at p. 582 (Bordelon's testimony that Breezy Shores spent

6

$68,000 on materials for the project; most of the materials were purchased before the permits were issued but he believed some materials were purchased after receipt of the permits)).

### B.    Revocation of the Land Use Certificate and Stop Work Order

19.    On July 31, 2019, at 9:15 a.m., a Baldwin County code enforcement officer in the planning and zoning department issued a Stop Work Notice and posted it on the Site, requiring Breezy Shores to cease all efforts to improve the Site. (Appendix Vol. III at p. 1459). That same day, then-Baldwin County Planning Director Jackson sent a letter to Breezy Shores' contractor, Steve Jones, revoking the LUC for the Site, same providing, in part, as follows:

> The purpose of this letter is to inform you that the approval granted for the above[-]referenced LU-190197 has been revoked, and the Land Use Certificate is hereby denied. The reason for this denial is based on a failure to meet off-street parking requirements as specified in Section 15.3.1 of the Baldwin County Zoning Ordinance. Specifically, two of the required spaces partially extend into the right-of-way of Ponce de Leon Court. In addition, the driveways, as shown on the site plan, do not provide unobstructed ingress and egress to each space.

(Appendix Vol. I at p. 878).

20.    The Zoning Ordinance § 18.2.5, outlines the following procedure for revocation of a land use certificate: "The Zoning Administrator may revoke a land use certificate issued in a case where there has been a false statement or misrepresentation in the application or on the site plan for which the Certificate was

7

issued or if after a documented warning has been issued the applicant has failed to comply with the requirements of these zoning ordinances." Jackson confirmed that there was no other provision of the zoning ordinance governing revocation of land use certificate applications. (Appendix Vol. I at p. 415).

21.    All Baldwin County employees involved admitted that there was no false statement or misrepresentation in the application or on the site plan for which the LUC was issued. (Appendix Vol. I at p. 416, 4-19; Appendix Vol. I at p. 263, 21-25; Appendix Vol. I at p. 264, 1-2; Appendix Vol. I at p. 240, 6-9). There was also no documented warning issued advising Breezy Shores that it had failed to comply with the zoning ordinance. (Appendix Vol. I at p. 416, 8-12). Thus, although Jackson testified that the exclusive mechanism for revoking a land use certificate was § 18.2.5, he acknowledged that there was no basis under that section to revoke the LUC. (Appendix Vol. I at p. 415, 1-25; Appendix Vol. I at p. 416, 13-22).

22.    It is undisputed that the Stop Work Order and the July 31 letter was a surprise to Breezy Shores. (Appendix Vol. I at p. 518-19; *see also id.*, Appendix Vol. I at p. 583). At no point prior to those events had Baldwin County, Jackson, or anyone else alerted Breezy Shores that it was in jeopardy of losing its LUC or that there were lingering parking issues related to the Site plan. (Appendix Vol. I at p. 315; Appendix Vol. I at p. 519; *see id.*, Appendix Vol. I at p. 583).

8

23.     Jackson testified that he did not revoke the LUC but, instead, revoked the approval of the LUC and then denied the LUC (*see, e.g.*, Appendix Vol. I at p. 341); however, while such language is contained in the letter, it simply cannot be refuted that what Jackson did was to revoke the LUC, as reflected by Jackson's own testimony (Appendix Vol. I at p. 466 (Jackson's admission that he revoked the land use certificate)), the face of the Stop Work Notice (Appendix Vol. III at p. 1459 ("This construction is in violation of the following provisions [of the zoning ordinance]: Revoked Land Use Certificate by Baldwin County Planning Director.")), and the recorded position of the Baldwin County Commission District 4, Board of Adjustment during its regular meeting on December 12, 2019 (Appendix Vol. I at p.  882-83 & p. 885-86). Indeed, the meeting minutes even suggest that Jackson recognized that the LUC was revoked. (*See id*., Appendix Vol. I at p. 886 ("Mr. Danley asked when was the permit withdrawn? Mr. Jackson responded, July 31ˢᵗ. Mr. Danley stated so in essence they would have to reapply for a permit. Mr. Jackson responded there were two parts. There was the stop work order and the revocation of the Land Use Certificate. With the revocation of the Land Use Certificate, they did not have a pending Land Use Certificate or building permit."))

24.     Moreover, planning technician Crystal Bates testified that planning director Vince Jackson "denied and revoked" the LUC (Appendix Vol. I at p. 251)

and that he otherwise had no ability to change or modify her decision for land use applications (*id.*, p. 252). As well, Lee testified that Jackson "revoked the land use[.]" (Appendix Vol. I at p. 271).

### C.    "Stacked Parking" and the Parking Ordinance

25.    The critical feature of Breezy Shores' Site development plan culminating in issuance of the Stop Work Order was the "stacked parking" arrangement. "Stacked parking" describes a parking configuration that allows for two (or more) vehicles to be parked one in front of the other on an axis perpendicular to the roadway, such that when both spaces are filled, the vehicle closer to the roadway obstructs the ingress and egress to the roadway from the vehicle further from the roadway. In issuing the Stop Work Order, the County stated that stacked parking violated § 15.3.1 of the Ordinance (the "Parking Ordinance"), which provides that "[o]ff-street parking spaces . . . must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space." (Appendix Vol. I at p. 1145).

26.    This section of the zoning ordinance applies to the entirety of Baldwin County; it is not a section limited solely to Planning District 25. (Appendix Vol. I at p. 346).

27.    Baldwin County had never before prohibited stacked parking

10

configurations for residential properties within Planning District 25 (where the Site was located) and had in fact approved plans containing such arrangements. (*See generally* Appendix Vol. I at p. 259-61 (Lee's trial testimony); *see also id.*, p. 357 ("[W]e knew that there had [] been some [stacked parking] that had been approved in the past.")). In an email to Jackson dated May 17, 2019, Lee indicated that § 15.3.1 "has never been used to require parking plans for residential developments." (Appendix Vol. I at p. 927; Appendix Vol. I at p. 259-60 (Lee's testimony that § 15.3.1 was "never used when we were looking at residential parking[.] . . . [N]o one ever applied it that way.")). Jackson responded to Lee, "You're right about section 15.3. I just believe it's intended for situations which are different from what we are talking about here.. . . I know we have probably approved land uses down there with stacked parking. We can't just up and decide to reverse course." (Appendix Vol. I at p. 927; Appendix Vol. I at p. 262 (Lee's trial testimony that she agreed with Jackson that the zoning department could not "just up and decide to reverse course" with respect to its previous interpretation of § 15.3.1); Appendix Vol. I at p. 261 (Lee's testimony that it was the belief of everyone in the zoning department at that time that § 15.3.1 was intended for commercial parking lots and the like)). Lee replied, "I don't think we've required an actual parking plan. I know I ha[d] one recently where the applicant said they had 4 parking spaces under the house (had to be stacked) and

I approved it." (Appendix Vol. I at p. 927; Appendix Vol. I at p. 262-63 (Lee's testimony that at one time the zoning department just looked to see whether "there was enough room for the number of [] parking spaces they said they had" and, for instance, if they said the parking spaces were under the house, the zoning department could tell there was enough room but only because they were stacked under the house); Appendix Vol. I at p. 261 (Lee's testimony that it was the belief of everyone in the zoning department at that time that § 15.3.1 was intended for commercial parking lots and the like)).

28.    Baldwin County had an established history of not applying § 15.3.1 to prohibit stacked parking configurations for residential developments (*cf.* Appendix Vol. I at p. 959 (referencing the "new" interpretation for parking)), and had routinely approved land uses that included such a feature (Appendix Vol. I at p. 357 ("[W]e knew that there had [] been some [stacked parking] that had been approved In the past.")).

29.    Yet Baldwin County shut down the Breezy Shores development (after previously approving their Site plan) for having a stacked parking configuration. (Compare Appendix Vol. I at p. 878 with Appendix Vol. III at p. 1459). Jackson admitted that this is the first time he can remember in his tenure as planning director (from 2011 to 2020) where a determination/change in interpretation of a zoning

ordinance caused the revocation of a land use certificate. (Appendix Vol. I at p. 362).

Jackson could not specifically recall whether stacked parking had ever been banned

by the planning and zoning department in Baldwin County before Breezy Shores

(Appendix Vol. I at p. 349) but he was certainly unaware of any land use certificate

applications, within the thousands he had seen in his tenure, that were turned down

for stacked parking (*id.*, p. 350).

30.    What changed between March 2019 (when Breezy Shores submitted its

LUC application with stacked parking arrangement, with no objection or request for

revision by Baldwin County) and July 31, 2019 (the date the LUC was revoked as a

putative result of the stacked parking arrangement) was that Baldwin County and

Jackson, in particular, came under pressure from one specific member of the

community to adopt a new interpretation of the Parking Ordinance that would

prohibit Breezy Shores' planned Site development. (Appendix Vol. I at p. 352; *id.*,

p. 363 (Jackson testified that Paul Stanton had frequently complained to him and his

staff about the EZ Breezy duplex development Bordelon was involved with and,

further, that Stanton wanted to prevent the Breezy Shores property from being

similarly developed)).

31.    In particular, on May 17, 2019, Paul Stanton, a neighboring landowner,

who was also a member of the Fort Morgan Civic Association, sent a series of emails

to Lee and Jackson demanding that stacked parking spaces at the Site should be deemed a violation of § 15.3.1. (*See, e.g.*, Appendix Vol. I at p. 919; *compare id. with* Appendix Vol. I at p. 258 (Lee's trial testimony that Stanton was expressing his opinion regarding how Section 15.3.1 ought to be interpreted in his emails on May 17, 2019); *id.*, p. 353 (Jackson's testimony that Stanton was advocating for a new interpretation of the parking ordinance)). Lee's initial reaction was to reject Stanton's interpretation, notifying him that, "[a]s to Section 15.3.1, it is staff's opinion that the language pertaining to 'unobstructed ingress and egress' refers to a more traditional parking lot found in commercial settings. [S]tacked parking is not addressed in the parking standards for Planning District 25." (Appendix Vol. I at p. 918; Appendix Vol. I at p. 258-59 (same established through the trial testimony of Lee)). Lee concluded this email with "We are aware that it is an issue and it may be addressed in a text amendment[]" to the zoning ordinance at some point (Appendix Vol. I at p. 918) because the zoning and planning department was aware of the issue with parking in Planning District 25, specifically, with people blocking the right of way, and wanted Stanton to know that the issue could be addressed in a future text amendment (Appendix Vol. I at p. 260).

32.    Stanton immediately replied with a follow-up email stating, "I respectfully disagree with this determination. I respectfully request [] a

determination by the Zoning Administrator which is appealable. I do believe an error has been made in the interpretation of the parking rules." (Appendix Vol. I at p. 935). Lee's reaction to Stanton's "barrage of emails" was that Stanton was "trying to catch us in some kind of trap." (Appendix Vol. I at p. 927; Appendix Vol. I at p. 261).

33.    On June 20, 2019 and June 24, 2019, Stanton again contacted Jackson about the Site, demanding "an official determination regarding whether or not Stacked Parking complies with the requirement in Section 15.3 regarding unobstructed ingress and egress of each parking space to the street." (*See, e.g.*, Appendix Vol. I at p. 912-13) (emphasis in original). Stanton was opposed to Breezy Shores' construction on the Site, at least in part because he had a website advertising access to the beach through Breezy Shores' lot. (Appendix Vol. I at p. 588 (Bordelon's testimony); *see also id.*, p. 589 ("[Stanton] even had a large arrow drawn on his website saying enter the beach here, the arrow pointed right in the middle of our empty lot, which was the Breezy Shores lot.")).

34.    Jackson responded on June 26, 2019, that he wanted to speak with Stanton in person or by telephone, explaining, "I think you will be pleased[.]" (Appendix Vol. I at p. 945). And while Stanton emailed Jackson later that afternoon stating a desire to meet with Jackson the following afternoon (*id.*), it is clear from Jackson's trial testimony that he did not meet Stanton in person (Appendix Vol. I at

p. 367 ("[W]e never did have a meeting.")) or speak to him on the phone (*see id.*, p. 384). Nevertheless, by July 3, 2019, Jackson had prepared a draft letter construing the Parking Ordinance, which he forwarded to Stanton with a note reading: "When you have a chance, please review the attached letter, and **let me know if this is what you are looking for in terms of an interpretation**. I'll ask Wayne to review it as well." (emphasis added) (Appendix Vol. I at p. 907; Appendix Vol. I at p. 925 (Jackson also sent the draft letter to Wayne Dyess on July 3); *see id.* (Dyess' response that the letter looked good to him, but that Jackson needed to be prepared to debate the meaning of "unobstructed"); Appendix Vol. I at p. 374 (Jackson's testimony that he wanted to make sure with Stanton that the contents of the July 3 letter would suffice Stanton's request for a formal determination)).

35.    Jackson sent a follow-up email to Stanton on July 8, 2019: "This is a follow-up to see if you have any comments or questions on the attached determination letter." (Appendix Vol. I at p. 907).  Stanton replied less than two hours later, "Thanks Vince. This is great." (Appendix Vol. I at p. 907). In that July 3 letter (which was addressed to Stanton), Jackson wrote the following:

> After careful consideration, it is my determination, as Zoning Administrator, that Section 15.3.1 does in fact prohibit stacked parking spaces in a manner which would potentially obstruct ingress and egress to each space. This determination is specific to the supplemental parking requirements which are found in the Local Provisions for Planning District 25, and which are applicable to single-family and two-

16

family properties (Section 2.3.25.3(c)).

(Appendix Vol. III at p. 1457). According to Jackson, his determination was not specific to Planning District 25 (Appendix Vol. I at p. 351 ("It applies everywhere.").

36.    Jackson did not inform anyone other than Linda Lee and Wayne Dyess, the County Administrator, of this policy change. (Appendix Vol. I at p. 301 (Jackson's testimony that Bates was unaware of "intervening things" from Breezy Shores' initial application to Bates' July 2019 approval of the application); Appendix Vol. I at p. 465 (Jackson's admission that word did not get out to all of his staff members); Appendix Vol. I at p. 367-68 (the policy change was not emailed to the county commissioners, though Lee knew about it)).

37.    There was no public announcement of the policy change and no amendments or revisions to the Parking Ordinance itself were made (Appendix Vol. I at p. 668, 383 (defense counsel's admission that the determination was never published)). And certainly, Mike Bordelon and Steve Jones were not notified of the policy change when the determination was made by Jackson on July 3, 2019. (Appendix Vol. I at p. 369; *see also* Appendix Vol. I at p. 519.

38.    As noted, Baldwin County approved the LUC (including site plan with a stacked parking configuration) on July 19, 2019. (Appendix Vol. I at p. 240). The employee who approved it, Crystal Bates, testified that when she did so, stacked

17

parking configurations at residential properties were permitted in Planning District 25. (Appendix Vol. I at p. 240; *see id.*, p. 249 (Bates' testimony that the subject land use application was subject to a full residential review for Fort Morgan, which included "site plan for parking, building plans showing the elevations, U.S. Fish and Wildlife permits, ADEM permit, and of course sewer, water, and driveway.")). No mistake was made by Bates in approving the LUC. *Id*. at p. 304 (Jackson's testimony that in granting approval, Bates did nothing wrong, and that Steve Jones did nothing wrong in taking the modified plan and ADEM certificate to the planning and zoning department)); p. 303-04 (Jackson's testimony that Bates was not reprimanded and that in granting approval of the application she did nothing wrong because she was unaware of the interpretation regarding parking)), since Jackson's policy change to the Parking Ordinance was never communicated to Bates or any other member of the staff, with the exception of Lee *see id.*, p. 243 (Bates' testimony that she was not reprimanded because of her approval of the land use certificate)), including that of former Zoning Administrator Jackson

39.     Bates was and is a planning technician with the Baldwin County Planning and Zoning Department and since her late-2015 hiring date has principally reviewed and approved land use certificate applications, along with zoning verifications. (Appendix Vol. I at p. 238-39). At the time she approved the subject

18

LUC, she unquestionably had the authority to approve it. (Appendix Vol. I at p. 243). Linda Lee testified that it was within Bates' powers and responsibilities in her position as planning technician to review and approve land use certificates. (Appendix Vol. I at p. 273; *see also id.*, p. 290, p. 302; Appendix Vol. I at p. 464-65 (Jackson's admission that when he delegated authority in his office, it was delegated, and that any action taken by a subordinate pursuant to that delegation binds the planning and zoning director and, as well, binds Baldwin County)). Moreover, as explained by Lee, once Bates approved and issued the LUC, her decision was not reviewed by anyone else, and that approval empowered the landowner to get a building permit. (Appendix Vol. I at p. 291; Appendix Vol. I at p. 464-65).

40.    The impetus for the Stop Work Order and the July 31 letter was (once again) correspondence from Stanton. In an email dated July 30, 2019, Stanton notified Jackson that pilings were being driven and construction had begun at the Site. Stanton stated, "If this has NOT been approved, Construction and Pyle [sic] driving should stop immediately tomorrow morning (7/31/19.)." (Appendix Vol. I at p. 902; Appendix Vol. I at p. 306-07, p. 308-10 (Jackson admits that he responded to Stanton's email at 5:55 p.m. on July 30, 2019, stating "'Paul, I'm aware of the situation. I will send someone down tomorrow to issue a stop-work order. I will contact you tomorrow with more information[,]'" but never identified when he found

19

out that Breezy Shores had its LUC and building permit, although he did try to suggest that the code enforcement officer was sent to the Site "to place a stop-work order if it was warranted.")).

41.    The following morning, Jackson and Baldwin County issued the Stop Work Order and later the July 31 letter notifying Breezy Shores for the first time of the novel interpretation of the Parking Ordinance to prohibit stacked parking configurations like the one in the Site plans. (Appendix Vol. I at p. 313).

**D.    The Revised Incidental Take Permit and Story Ordinance Development**

42.    Surprised by the abrupt posting of the Stop Work Order at the Site with no prior warning on the morning of July 31, 2019 (Appendix Vol. I at p. 314, p. 324 & p. 327 (Jackson's testimony that he did not reach out directly to Steve Jones or Mike Bordelon on July 31—or July 30, by calling them—that there were problems with the project and that a stop-work notice was going to be posted, but simply wrote the July 31 letter)), Breezy Shores contacted the planning department in an effort to resolve the issue (*see id.*, p. 314-15; Appendix Vol. I at p. 519-20).

43.    At that time, Breezy Shores learned that its LUC had been revoked by Jackson. Notably, neither Lee nor Bates could remember a land use certificate being revoked during their tenure in the zoning department (before this revocation) and agreed that it would be unusual to have anything revoked. (Appendix Vol. I at p.

20

243; *see also id.*, p. 275-76 (Lee has been in the planning department since 2006 and has been involved with thousands of land use certificate applications, and in none of those cases was the land use certificate revoked)).

44.     Although Breezy Shores disagreed with Jackson's interpretation of the Parking Ordinance, they elected to resolve the parking issue and submitted a revised Site plan containing a revised parking configuration that complied with Baldwin County's new interpretation of the Parking Ordinance. (Appendix Vol. I at p. 398; Appendix Vol. I at p. 520; Appendix Vol. I at p. 590).

45.     In response, Linda Lee notified Breezy Shores on August 16, 2019, that (per the Planning Director) they would need a revised incidental take permit ("ITP") from the United States Fish and Wildlife Service ("USFWS") before they could resume construction on the Site. (Appendix Vol. III at p. 1508-1509; Appendix Vol. I at pp. 520, 897).

46.     William Lynn, a biologist at the USFWS, confirmed receipt of Breezy Shores' application for a revised ITP on August 20, 2019. (Appendix Vol. I at p. 593).

47.     Approximately six weeks later, on October 2, 2019, Lynn notified Breezy Shores that the incidental take permit "is very close to being issued, hopefully later this week." (Appendix Vol. III at 1537).

48.    It remains unclear exactly what happened at the USFWS between August 20 and October 2. The record reflects that certain non-party property owners in Fort Morgan actively lobbied Lynn and the USFWS to delay issuing a determination on Breezy Shores' application for a revised ITP. For example, on August 21, 2019, a property owner sent an email to Lynn that included the following passage: "Again, please help us delay [the Site] anyway you can. This new parking interpretation and the proposed 2 story limit will dramatically reduce the size of these mega structures." (Appendix Vol. I at p. 959). This email attached a copy of a proposed new Baldwin County ordinance limiting single- and two-family structures to two stories and observed that the Site "is the first structure in District 25 to be required to comply with this new 'interpretation' for parking. This is a huge win for the beach." (*Id.*). And while there was no direct evidence offered at trial that Lynn or anyone else at USFWS actively delayed processing Breezy Shores' revised incidental take permit application in acquiescence to this request from a community activist, the evidence is that Breezy Shores' revised incidental take permit application was not approved by Lynn until after Baldwin County's brand-new zoning ordinance limiting the height of single-family and two-family structures in Planning District 25 to two habitable stories was enacted on October 15, 2019.

49.    On October 7, 2019, Lynn indicated that Breezy Shores' "permit is

almost ready for printing," with only two minor additional steps for Breezy Shores to take. (Appendix Vol. I at p. 114, p. 3189; Appendix Vol. III at 1537).

50.    Also on October 7, 2019, Jackson emailed Lynn about a "series of proposed zoning text amendments pertaining to Planning District 25 (Fort Morgan)[,]" asking that he comment on them and highlighting that his department had received "a good deal of pushback[,] particularly on the proposed two story height limitation for single family and duplex structures." (Appendix Vol. I at p. 965).

51.    Breezy Shores promptly complied with those requests, including paying for the permit (Appendix Vol. I at p. 593), and received confirmation by October 10, 2019 (*see id*.). When days passed without receipt of the permit, Bordelon reached out to Lynn on October 15, 2019 to inquire as to the status of the Site's ITP. (Appendix Vol. I at p. 593). Lynn did not respond. (*See id.*, p. 594)). Bordelon emailed Lynn again on October 22, 2019 (*id.*) and the USFWS finally issued the revised ITP on October 25, 2019 (Appendix Vol. III at p. 1464).

52.    Bordelon immediately forwarded that permit to Baldwin County and requested that the Stop Work Order be lifted. (Appendix Vol. I at p. 595; Appendix Vol. III at p. 1464; Appendix Vol. I at p. 405-07).

53.    Unfortunately for Breezy Shores, Baldwin County had undertaken

other steps antithetical to the proposed Site development in the interim. On October 15, 2019, as Breezy Shores awaited issuance of the ITP after having complied with all prerequisites, Baldwin County enacted a brand-new zoning ordinance limiting the height of single-family and two-family structures in Planning District 25 to two habitable stories (the "Story Ordinance"). (*See generally* Appendix Vol. II at p. 1265; Appendix Vol. I at p. 461).

54.     Because of these intervening developments relating to issuance of the Story Ordinance, Baldwin County did not lift the Stop Work Order when Breezy Shores submitted its revised ITP on October 25, 2019. Instead, on November 5, 2019, Jackson sent an email to Breezy Shores' counsel explaining, "A new issue has arisen regarding this property and the proposed duplex structure." (Appendix Vol. I at p. 463). Jackson detailed the Story Ordinance adopted on October 15, 2019, and outlined the ramifications of that amendment for Breezy Shores as follows:

> When the stop work order was imposed, the land use certificate application was rescinded and denied. As a result, there was no pending application at the time the text amendments were adopted. A new land use certificate application, which shows compliance with all current zoning requirements including the [Story Ordinance], will be required to move forward. [A] duplex (two-family dwelling) with three habitable stories cannot be approved. (*Id.* (*footnote omitted*)).

55.     Revising the Site plan to two habitable stories was potentially

financially crippling for Breezy Shores because of the corresponding reduction in rental revenues the property could generate. As a result, Breezy Shores elected to appeal Jackson's decision to the Board of Adjustment. (Appendix Vol. I at p. 736; Appendix Vol. I at p. 461 & Appendix Vol. I at p. 700-01).

56.    On December 12, 2019, following a hearing, the Board of Adjustment entered a written Notice of Action upholding the administrative decision of the zoning administrator and denying the appeal. (Appendix Vol. I at p. 887; *see also generally* Appendix Vol. I at p. 467-74). Breezy Shores filed a Notice of Appeal to the Circuit Court of Baldwin County, Alabama, on December 16, 2019. (Doc. 44).

### E.    Compensation for Baldwin County's Temporary Taking

57.    Bordelon testified that he expected the Breezy Shores project to be constructed by July of 2020. (Appendix Vol. I at p. 598). And because he believed that it would take at least a year to construct beginning immediately after trial, Breezy Shores lost approximately 3 years of rental income. (*See id.*). Taking as a reference the 2019 rental of the 18-bedroom EZ Breezy next door, which generated net revenue of $257,000—the gross revenue was $357,000, but rental management expenses, lodging tax, and repairs took that down to $257,000.  Accounting for the fact that Breezy Shores has only 14 bedrooms (as opposed to 18), Bordelon estimated that the total net revenue he lost per year was $199,888.00, which totals

$599,666.00 for three years. (Appendix Vol. I at p. 599-600). The precise numbers were $256,546.00 for the EZ Breezy duplex of 18 bedrooms, making the estimated net revenue for a 14-bedroom duplex (Breezy Shores) $199,538.28; this latter number multiplied by 3 totals $598,614.84. (Appendix Vol. I at p. 615-16).

58.    In 2020, the gross revenue on EZ Breezy was $315,000, with the net being $198,000 or $200,000. (Appendix Vol. I at p. 600). According to Bordelon, however, 2020 was an outlier because it "was the COVID year[.]" (*Id.*, p. 601 ("We had a record year in '21 and '22 bookings are really, really strong.")).

59.    In addition, when Steve Jones provided his initial cost plan, the cost of Breezy Shores was estimated at $1.12 million, $138.00 a square foot based on 8,089 square feet. (Appendix Vol. I at p. 516-17). However, the cost of building materials and construction costs in general have indisputably risen since July of 2020, the projected end date of the Breezy Shores duplex, with Jones testifying construction would be $225.00 a square foot and Bordelon testifying that the minimum would be $225.00 a square foot but probably closer to $235.00 a square foot based on his recent experiences. (*Id.* at p. 618 & p. 653; *compare id. with* Appendix Vol. I at p. 601-02; Appendix Vol. I at p. 525-26 (Jones estimated that the cost per square foot had risen to $225.00 due to increased costs of materials—lumber, tile, HVAC, etc.— and labor)). Multiplying the Breezy Shores square footage of 8,089 by $225 renders

26

a total of $1.82 million and by $235 renders a total of $1.9 million. (Appendix Vol. I at p. 618 & p. 653). And subtracting the original costs of $1.12 million from those numbers renders totals of $700,000.00 and $780,000.00, respectively. (*See id.*, p. 618 & p. 654; *compare id. with id.*, p. 619 (the precise differences are $699,118.44 and $780,008.44)).

### III.    STANDARD OF REVIEW

Appellees adopt the Standard of Review in Appellants' Opening Brief. (Doc. 11, pp. 20-21).

### SUMMARY OF THE ARGUMENT

Baldwin County has taken the position that the Land Use Certificate (the "LUC") at issue in this case was mistakenly issued, and that such an administrative regulatory mistake of such a kind does not rise to the level of a constitutional violation.

Baldwin County's position distorts the factual record past the point of implausibility. As admitted by County employees at trial, Breezy Shores was properly issued a LUC and Building Permit by zoning officials with all requisite authority, applying an interpretation of the pertinent zoning ordinances that had prevailed for many years.  It was only after Breezy Shores bought materials and began constructing a foundation that the Baldwin County Zoning Director Vince

27

Jackson kowtowed to pressure from neighboring landowners, ignored the provisions of the Baldwin County Zoning Ordinance that govern the revocation of Land Use Certificates, and halted construction.

The compensation granted to Breezy Shores was based on substantial evidence. The award of increased construction costs and lost profits during the period of a temporary taking is fully consistent with this Court's precedent.

The district court properly held that Breezy Shores had a vested right in the LUC that was properly issued to it by Baldwin County. Baldwin County urges this Court to reweigh the evidence to prioritize post-hoc "health and safety" when a far more plausible narrative was presented to and accepted by the district court.

## ARGUMENT

Breezy Shores' LUC was a vested property right under Alabama law. The revocation of the LUC was an unconstitutional *Penn Central* taking that was contrary to the Fifth Amendment and the legal and equitable relief afforded by the trial court to remedy this violation was reasonable and fair. The lower court's well-reasoned determination should be affirmed.

## I.  BREEZY SHORES HAD A VESTED RIGHT UNDER THE LAND USE CERTIFICATE AND BUILDING PERMIT.

The Constitution does not create property but instead, protects those property rights that are acknowledged by state law. *Phillips v. Washington Legal Found.*, 524

28

U.S. 156, 164 (1998) ("because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law") citing *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (same); *Marine One, Inc. v. Manatee Cnty.*, 877 F.2d 892, 894 (11th Cir. 1989) ("state law creates and defines the parameters of a plaintiff's property interest for section 1983 purposes. Whether state law has created a property interest is a legal question for the court to decide")

To that end, building permits and other vested rights can be considered separate and distinct properties. *See* John J. Delaney & Emily J. Vaias, *Recognizing Vested Development Rights as Protected Property in Fifth Amendment Due Process and Takings Claims*, 49 Wash. U. J. Urb. & Contemp. L. 27, 34-35 (1996).  And more specifically, in this case, Breezy Shores' LUC was a vested property right under Alabama law. *See* Appendix Vol. III, at p. 109, 133-136*; Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1211 at n. 1 (11th Cir. 1995) (equating vested rights with protected property interests); *Grayson v. City of Birmingham*, 277 Ala. 522, 525, 173 So. 2d 67, 69 (1963) ("such changes, investments, and permits, relating as they do to structures initiated or completed, are made the criteria of hardships

29

imposed on the property owner and judicially recognized to sustain the claims of vested rights"). This independent property came into being on July 17, 2019, when the LUC was approved as a matter of right by Baldwin County. (Appendix Vol. I, at p. 240, 300, 730).

Baldwin County argues that the District Court erred in finding that Breezy Shores had vested rights under the LUC and Building Permit for two reasons.

First, Baldwin County argues that the District Court erroneously interpreted the Parking Ordinance, such that its holding that the initial issuance of the LUC and Building Permit were valid constituted reversible error.

While Baldwin County now continues to insist that the Parking Ordinance had been "incorrectly interpreted" for 20 years, and that the permits here were invalidly issued, that insistence is at odds with the testimony of a parade of Baldwin County's own witnesses. Planning Director Vince Jackson, Planner Linda Lee, and Planner Crystal Bates all testified that the permits at issue were properly issued. Planner Crystal Lee acted under the specific authority delegated to her and others by the Planning Director to approve and issue land use certificates in accordance with the Baldwin County Zoning Ordinance and acted in accordance with that authority.

While it is true that a permit issued in violation of a zoning ordinance is "invalid, and the permittee acquires no vested rights thereunder" that was simply not

what the facts showed in this case. *See Board of Zoning Adjustment for City of Lanett v. Boykin*, 92 So. 2d 906, 910 (Ala. 1957). In *Boykin*, the landowner had received a building permit for certain improvements to an existing nonconforming use, but the zoning ordinance in that case clearly stated that a permit could not be granted for structural alterations that extended the life of an existing nonconforming use. *Id*. at 909. The court concluded that reflooring 50% of the floor space, reroofing 50% of the dwelling, making separate entrances and installing separate water, heating and lighting systems, was such an alteration to the dwelling as to prolong indefinitely the life of the nonconforming use. *Id*. Here, the great weight of evidence discussed at length throughout this brief and by the district court in its memorandum opinion shows that the LUC issued here was consistent with the text of the zoning ordinance and longstanding precedent interpreting it.

Second, Baldwin County argues that the District Court erred in applying the law as announced by *Breland v. City of Fairhope*, 337 So. 2d 341 (Ala. 2020) by failing to give determinative weight to the "health and safety concerns" related to the Parking Ordinance manufactured *post-hoc* out of whole cloth (and without any citation to record evidence) by Baldwin County. In other words, Baldwin County asks this Court to reweigh the evidence to its liking, without paying any consideration to the credibility (or lack thereof) of the witnesses at trial. This

31

argument fails as a threshold matter because neither *Breland*, nor any other Alabama case on vested rights, requires determinative weight be given to "health and safety concerns" over other circumstances relevant to the inquiry.

The District Court was entitled to weigh the evidence adduced at trial and conclude that the timing of the LUC revocation, which occurred immediately after complaints from neighbors, showed the true impetus for change in the Parking Ordinance interpretation. Similarly, evidence at trial showed that the manner of the change in interpretation, which was done in secrecy and not communicated to either the zoning department or the public, was a result of its rationale – placating Paul Stanton – rather than promoting "health and safety". After all, how would community health and safety be advanced by a secret policy change known only to two members of the zoning department? Further, the Baldwin County Zoning Ordinance contained numerous provisions designed to govern the revocation of land use certificates that were undeniably not followed here. Even if evidence was presented that health and safety concerns animated some part of Baldwin County's decisions, the trial court was entitled to weigh the landowner's interests, including its expenditures and reliance on Zoning Ordinance and determinations of zoning personnel, and the fact that Baldwin County did not follow the revocation procedure in its own ordinance, and conclude that equity favored the landowner. The trial court

was well within its discretion to find that equity favored the recognition of Breezy Shores' permits as a vested right to construct a three-story duplex on its site.

## II. THE REVOCATION OF THE VESTED LAND USE CERTIFICATE WAS A REGULATORY TAKING

Breezy Shores possessed a vested LUC to construct a multi-family residence, with three habitable stories, and stacked parking. Baldwin County's revocation of that property right was an unconstitutional *Penn Central* taking that was contrary to the Fifth Amendment.

### A.    The Taking of the Land Use Certificate was a Final Determination

Baldwin County contends that the lower court erred in focusing on the Stop Work Order because it was not a final determination. *See* Opening Brief at p. 28-29. However, the lower court's decision was based on the revocation of the vested LUC. (Appendix Vol. III, pp. 124-26). And the revocation of the LUC was a final determination that was ripe for adjudication. As Jackson confirmed:

> …So it was denied. Yes, it put it back in an incomplete status, but it wasn't pending. It was a denied application. So it wasn't—it wasn't a case where you had a denied application that's just sitting out there and the decision is waiting on the revised Incidental Take Permit. The decision had already been made.
> ***
> A decision had been made on it. So, I mean, like I said, the way I view pending is you haven't made a decision yet. We made the decision.
> ***
> But—but, you know, in my view, there was not a—there was not a pending application. There was a—there was a denied land use, but the

denied land use didn't give them the right to do anything.

(Appendix Vol. I at p. 409-10). Breezy Shores subsequently appealed the revocation of the LUC to Baldwin County. (Appendix Vol. I at p. 736, *et seq.*). The appeal was denied. (Appendix Vol. I at p. 881-87; Vol. III at p. 17, *et seq.*).

Therefore, the revocation of the vested LUC was a final decision, properly considered by the lower court. *Pakdel v. City & Cnty. of San Francisco, California*, 141 S. Ct. 2226, 2230 (2021) ("The finality requirement is relatively modest. All a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question.") (cleaned up).

## B.    The Revocation of the LUC was a *Penn Central* Taking

Baldwin County's revocation of the vested LUC effected a *Penn Central* taking. It caused a substantial economic loss to Breezy Shores, it significantly interfered with its reasonable investment backed expectations, and this burden was disproportionally focused upon a single property owner, compelling Breezy Shores alone to bear the cost for all. Accordingly, the lower court's decision should be affirmed.

The *Penn Central* test is an ad hoc determination that is based upon all relevant facts and circumstances. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Certain facts are of "particular significance"—the economic

impact of the regulation, the extent to which the regulation has interfered with reasonable investment-backed expectations, and the character of the regulatory action. *Id.* But at the same time, these facts are "guideposts," not "mathematically precise variables." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634 (2001) (O'Connor, J., concurring); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 326-27 (2002) (same). Every case must be looked at individually and there is "no magic formula." *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012) ("[N]o magic formula enables a court to judge, in every case, whether a given government interference with property is a taking. In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area."); *Palazzolo*, 533 U.S. at 634 (the Court has explicitly "eschewed any set formula" and "the outcome instead depends largely upon the particular circumstances [in that] case").

The guiding principle is simply fairness. *Palazzolo*, 533 U.S. at 635-36 (O'Connor, J., concurring) ("Courts instead must attend to those circumstances which are probative of what fairness requires in a given case. . . . As before, the salience of these facts cannot be reduced to any 'set formula.'"); *Eastern Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) ("[T]he process for evaluating a regulation's

constitutionality involves an examination of the 'justice and fairness' of the governmental action.").

In this case, all of the *Penn Central* guideposts, and all other relevant facts and circumstances, support the affirmance of the lower court's determination.

1.    The Character of the Regulatory Action By Itself Affirms the Lower Court's Determination

Because Breezy Shores possessed a vested LUC, if the County wanted to take it away, its only option was to exercise the power of eminent domain. But that did not happen here. The County tried to take Breezy Shores' development by regulation instead, re-interpreting its parking ordinance with the sole purpose of stopping one specific development on one specific property, at the insistence of a neighboring owner. By placing this severe and disproportionate burden solely upon Breezy Shores' shoulders, the character of the regulatory action by itself is sufficient to affirm the lower court's decision. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (the "common touchstone" of regulatory takings jurisprudence is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain"). At the minimum, the lower court's evaluation of the facts presented at trial was not clearly erroneous.

The character prong of *Penn Central* is an assessment of the severity of the

36

regulatory action. *See Lingle*, 544 U.S. at 539-40 ("[E]ach of [the distinct regulatory takings tests] focuses directly upon the severity of the burden that government imposes upon private property rights."); *South Grande View Dev. Co., Inc. v. City of Alabaster, Alabama*, 1 F.4th 1299, 1311 (11th Cir. 2021) (citing to *Lingle*, "the character of the government action is another way to examine the severity of the government interference with property rights"). It measures what the regulation does, who it impacts, how it affects the owner's reasonable expectations of property, and how the burden is distributed between the individual owner and the public. *CCA Assocs. v. United States*, 91 Fed. Cl. 580, 602 (2010), *aff'd in part, rev'd in part*, 667 F.3d 1239 (Fed. Cir. 2011) (character is "the actual burden imposed on property rights, and how that regulatory burden was *distributed* among property owners") (cleaned up); *Cienega Gardens v. United States*, 331 F.3d 1319, 1338 (Fed. Cir. 2003) (finding with respect to the character that "the expense was placed disproportionately on a few private property owners").

In this way, one can view character as a driving force behind *Penn Central* determinations. After all, economic impact and reasonable investment-backed expectations are both impacted by the severity of the regulatory burden imposed. *See Penn Central*, 438 U.S. at 149-50 (Rehnquist, J., dissenting) ("[I]t is the character of the invasion, not the amount of damage resulting from it, so long as the

damage is substantial, that determines the question whether it is a taking."); *Lingle*, 544 U.S. at 540 ("[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the *magnitude* of a regulation's economic impact and the *degree* to which it interferes with legitimate property interests.") (emphasis added).

The Supreme Court has held that character alone can be sufficient to find a *Penn Central* taking. In *Hodel v. Irving*, the issue pertained to the Indian Land Consolidation Act, which stripped Tribe members of their right to devise their property. 481 U.S. 704 (1987). After evaluating the economic impact, the reasonable investment-backed expectations, and the reciprocity of advantage, the Court noted that "if we were to stop our analysis at this point, we might well find [the Act] constitutional." *Id.* at 716. But nonetheless, the Court found a *Penn Central* taking based solely upon character. "[T]he character of the Government regulation here is extraordinary. . . . the regulation here amounts to the abrogation of the right to pass on a certain type of property—the small undivided interest—to one's heirs. In one form or another, the right to pass on property—to one's family in particular—has been part of the Anglo-American legal system since feudal times." *Id.* at 717; *Babbitt v. Youpee*, 519 U.S. 234 (1997) (same).

Returning to the case at hand, as discussed above, Breezy Shores possessed a vested LUC. And the County did not have the authority to revoke it. Revocation was

only permissible if there was a zoning violation, a misrepresentation, or a fraud (Appendix Vol. I at p. 416, 1174-75) and multiple County officials testified that there was no such issue with Breezy Shores' LUC. (Appendix Vol. I at p. 263-64, 300, 416). As the lower court found "[Planning Director] Jackson had no authority or power to revoke [Breezy Shores'] Land Use Certificate." (Appendix Vol. III at p. 110).

But the County revoked the LUC anyway. The revocation was the product of the unremitting efforts of Breezy Shore's neighbor, Paul Stanton, whose goal was to prevent Breezy Shores from being developed. (Appendix Vol. I at p. 363). Although the reason why is unconfirmed, it could have been because Stanton advertised his own rental property as having beach access through the vacant Breezy Shores lot. (Appendix Vol. I at p. 588-89). Stanton also frequently complained to the County about the Respondents' adjacent development (and Stanton's rental competitor), Easy Breezy. (Appendix Vol. I at p. 363). Whatever the reason, Stanton chose to use the Baldwin County Parking Ordinance as the tool to stop Breezy Shores, arguing that Section 15.3.1 of the Baldwin County Zoning Code prohibited stacked parking in residential areas. (Appendix Vol. I at 930). According to Jackson, Stanton was "advocating for a new interpretation of the parking ordinance." (Appendix Vol. I at p. 353).

The Parking Ordinance had never been interpreted in this way before and Baldwin County did not seem particularly inclined to change it now. (Appendix Vol. I at p. 927, 930). According to Jackson, Lee, and Bates, stacked parking was always permissible for residential developments. (Appendix Vol. I at p. 240, 258-60, 261, 356-57, 359, 927, 930, 935-36). The County had approved all other residential developments with stacked parking. (Appendix Vol. I at p. 261-62, 357, 927). And in fact, from 2002-2020, Jackson could not recall any residential development that had their land use certificate turned down because of stacked parking. (Appendix Vol. I at p. 349-50).

Nonetheless, Stanton continued his campaign. Warning that "the community is watching this project like a hawk," (Appendix Vol. I at p. 948), he told the County that he disagreed with their interpretation and he wanted an official decision on the Breezy Shores parking that he could appeal, sending increasingly insistent emails on May 17, May 20, and June 24. (Appendix Vol. I at p. 912-14, 946-47).

Ultimately, Stanton prevailed. But the reason why remains a mystery. Although he later claimed that this was a joke (Appendix Vol. I at p. 355), at one point, Jackson said "I might be the one who gets fired. This barrage of emails [from Stanton] demanding specific answers TODAY is beyond ridiculous." (Appendix Vol. I at p. 928). Lee responded "I totally agree. I feel like he's trying to catch us in

some kind of trap." (Appendix Vol. I at p. 927). Nonetheless, the County has no records of how or why the determination was made because it was all just "in [Vince Jackson's] head." (Appendix Vol. I at p. 376).

Thus, the prohibition against stacked parking would now apply to single family residences and two-family residences. (Appendix Vol. III at p. 7). Jackson also made sure to consult with Stanton first, asking "let me know if this is what you are looking for in terms of an interpretation." (Appendix Vol. I at p. 907; Appendix Vol. III at p. 7). Stanton gave his seal of approval. (Appendix Vol. I at p. 907. ("Thanks Vince. This is great. I agree with your determination…")). It is also noteworthy that while Parking Ordinance Section 15.3.1 applied to the entirety of Baldwin County, (Appendix Vol. I at p. 346, 1145 (Jackson's re-interpretation of stacked parking was delineated only in Planning District 25 where Breezy Shores was located); Appendix Vol. III at p. 7).

Enforcement of this new interpretation also fell to Stanton. After Breezy Shores was issued its LUC, it was Stanton, not Baldwin County, who took the initiative to get a Stop Work Order issued. (Appendix Vol. I at p. 902 and p. 305, 306). Jackson had the Stop Work Order served the next morning, along with the concomitant revocation of the LUC. (Appendix Vol. I at p. 878-79, Vol. III, p. 13). According to Jackson, Lee, and Bates, an LUC had never before been revoked.

(Appendix Vol. I at p. 243, 275-76, 362).

All this time, Breezy Shores had no idea of what was happening in the background. It was a battle that was played out behind closed doors and from which Breezy Shores was entirely excluded. The first that it learned of any of this was when the Stop Work Order was issued.

The story of Breezy Shores reflects the character of the County's regulatory action and the severity of the burden that was imposed on this property owner. Contrary to the County's argument, the revocation of the LUC was not simply the correction of some inadvertent "error" or a "regulatory mistake." *See* Opening Brief at p. 38-39. Nor was it simply a normal permitting delay. *See* Opening Brief at p. 40. Nor does the County's plea for deference to its zoning decisions have any relevance.

The revocation of the LUC represented a reversal of course and a new interpretation of the zoning code; done in secret; carried out contrary to the Planning Code; and not targeted at the public as a whole, but at Breezy Shores specifically, at the insistence of a neighbor that did not want to see this development built. While it could be true that the elimination of stacked parking in residential developments may be a benefit to the community, this change of interpretation was weaponized against Breezy Shores and forced this singular property owner to bear the full cost of this regulatory action. Thus, the severity of the County's interference with Breezy

Shores' private property rights was extraordinary and the character of the County's regulatory action alone justifies affirming the lower court's determination that a *Penn Central* taking had occurred.

> 2.    The Destruction of Reasonable Investment-Backed Expectations Confirms a Regulatory Taking

Reasonable investment backed expectations are an objective determination predicated upon the expectations of market participants. *Lucas*, 505 U.S. at 1035 (Kennedy, J., concurring) ("The expectations protected by the Constitution are based on objective rules and customs that can be understood as reasonable by all parties involved"); *Cienega Gardens*, 331 F.3d at 1345-46 ("This factor also incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be 'reasonable.'"); *see Palazzolo*, 533 U.S. at 630 ("The determination whether an existing, general law can limit all economic use of property must turn on objective factors . . .").

In this case, the evaluation is straightforward: Breezy Shores reasonably expected to be able to develop its property consistent with what any other market participant would have expected based upon what was known at the time of the LUC approval. In other words, Breezy Shores could have reasonably expected to build a multi-family residential building with three habitable stories and stacked parking. (Appendix Vol. I at p. 730). Case in point, the principal owners of Breezy Shores

43

previously built "Easy Breezy" next door, which was a multi-family residential building with three habitable stories and stacked parking. (Appendix Vol. I at p. 513-14, 521-22, 527-28, 572-76, 591).

Conversely, neither Breezy Shores, nor any other market participant, would have reasonably expected to have their vested LUC revoked. As stated above, the Baldwin County Zoning Code prohibited such revocations absent a zoning violation, a misrepresentation, or a fraud and none were present here. Nor could Jackson, Lee or Bates remember any other instance of a land use certificate being revoked.

Although Jackson's interpretation of stacked parking changed prior to the issuance of the LUC, clandestine changes have no impact upon objectively reasonable investment-backed expectations. Breezy Shores was not told about the change in interpretation. (Appendix Vol. I at p. 369, 465, 479). No revisions or changes were made to the Parking Ordinance, nor was any change published. (Appendix Vol. I at p. 383 (sidebar admission by County counsel)). The new interpretation was not communicated to the public at large. *Id.* It was not communicated to the larger Baldwin County Planning Staff. (Appendix Vol. I at p. 240-41, 301, 303-04, 330-31, 465). It was not communicated to the Baldwin County Commissioners. (Appendix Vol. I at p. 367). And it was not put on the County website. (Appendix Vol. I at p. 368). Even Bates was of the opinion that stacked

parking was permissible for all residential developments in that district (Appendix Vol. I at p. 240).

Breezy Shores, therefore, had no idea that the revocation was coming. (Appendix Vol. I at p. 514-15, 518-19, 591). And as the 11th Circuit held, "Interference with investment-backed expectations occurs when an inadequate history of similar government regulation exists: where the earlier regulation does not provide companies with sufficient notice that they may be subject to the new or additional regulation." *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1432 (11th Cir. 1998), *abrogated on other grounds by South Grande View Dev. Co., Inc.*, 1 F.4th at 1310; *see Eastern Enterprises*, 524 U.S. at 532-33 (in a plurality determination stating that retroactivity "is generally disfavored in the law in accordance with fundamental notions of justice" because "it can deprive citizens of legitimate expectations and upset settled transactions").

Baldwin County argues that that Breezy Shores adopted a stance of "willful ignorance," was "ostrich like," and never "attempted to keep up with regulatory developments." *See* Opening Brief at p. 35-36. This is nonsensical. The inability of Breezy Shores to telepathically determine the reversal of course that Jackson had kept hidden from Breezy Shores, the public at large, his own Planning staff, and the Baldwin County Commissioners, does not defeat a regulatory takings claim.

The County also focuses on the wrong property right by viewing reasonable investment backed expectations through the lens of the underlying land and the Height Ordinance. *See* Opening Brief at p. 36-37. The property at issue here is the LUC and as such, the focal point is Breezy Shores' reasonable investment-backed expectation to construct a multi-family residential building with three habitable stories and stacked parking. A similar circumstance was presented by the 11th Circuit's collected *Wheeler v. City of Pleasant Grove* matters.[1] Because the taking was of "an already authorized building permit" *Wheeler I*, 664 F.2d 99, 100 (5th Cir. 1981), the court determined that the basis of the regulatory takings inquiry must be the vested permit, not the land. *Wheeler IV*, 896 F.2d at 1351 ("The unconstitutional taking which this court found compensable was not a denial of all use of the Pleasant Grove property. . . . The City confiscated appellants' right to construct an apartment complex previously authorized by the City.")

In light of the above, the taking of the vested LUC destroyed Breezy Shores' reasonable investment-backed expectations.

### 3. The Economic Impact Affirms a Regulatory Taking

Baldwin County did not present any evidence of economic impact. It did not

---

[1] *Wheeler I – Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir. 1981); *Wheeler II* – 746 F.2d 1437 (11th Cir. 1984); *Wheeler III* – 833 F.2d 267 (11th Cir. 1987); *Wheeler IV* – 896 F.2d 1347 (11th Cir. 1990).

proffer an expert real estate appraiser, or any evidence of value, or any evidence about the financial impact resulting from the revocation of the LUC. In the face of this complete default, all due deference must be given to the economic determinations of Breezy Shores.

Breezy Shores suffered significant economic harm from the taking of the LUC. Breezy Shores suffered a loss of $599,600 in rental income (Doc. 79), $3,000 for the cost of moving the pilings (*id*.) and $128,308 in increased construction costs, as found by the trial court (Appendix Vol. III at p. 133). Breezy Shores thus incurred a "considerable financial burden" commiserate with the taking of the LUC. *See Eastern Enterprises*, 524 U.S. at 529 (in the context of a *Penn Central* case regarding an employee benefit fund, the Court found that the economic impact prong was satisfied due to the "considerable financial burden" placed upon the owner).

As with reasonable investment-backed expectations, the County erred in focusing its economic arguments upon the land and not the LUC. *See* Opening Brief at p. 30-31, 33-34. It fares no better in claiming that the economic impact was minimal due to the temporary nature of the government action. *See* Opening Brief at p. 33. The LUC revocation was only temporary because the trial court ordered this vested property right to be reinstated, directed the County to issue a variance, and permanently enjoined the County from doing anything to interfere with Breezy

Shores' vested right to develop its property. (Appendix Vol. III at p. 140-42). The relief afforded by the trial court in response to the County's unconstitutional actions cannot be used as a sword to then contend that those same actions were never actually unconstitutional.

Considering the above, the lower court's determination that the revocation of the LUC was a *Penn Central* taking should be affirmed.

## III.  THE COMPENSATION AWARDED WAS SUPPORTED BY THE EVIDENCE

### A.  Lost Income and increased construction costs are compensable.

Generally, when determining compensation due pursuant to a takings claim "the question is, [w]hat has the owner lost?" *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 (11th Cir. 1987) ("*Wheeler III*"). "The goal of the Fifth Amendment's just compensation requirement is to return the affected property owner to 'as good position pecuniarily as he would have occupied if his property had not been taken.'" *AA Profiles, Inc. v. City of Fort Lauderdale*, 253 F.3d 576, 583 (11th Cir. 2001) (quoting *United States v. Miller*, 317 U.S. 369, 373 (1943)).

Evidence regarding the valuation of the property is relevant if related to the property's value *in any way*. "'Relevant evidence' in a takings case includes anything related to the value of the property taken." *South Grande View Development Co., Inc.*, 1 F.4th at 1309. This Court has stated that "we commonly

48

sustain [just compensation] awards that are 'within the scope of the evidence.'" *Id.* at 1312 (quoting *United States v. 9.20 Acres of Land*, 638 F.2d 1123, 1126 (8th Cir. 1981) (internal citations omitted).

The overriding objective of the just compensation clause in the temporary takings context is to restore loss of income during the period of the temporary taking. *AA Profiles*, 253 F.3d at 584.  Courts have employed numerous methodologies to accomplish this end.  These methodologies have varied based upon individualized circumstances, but have all sought to restore the property owner to the position it would have occupied had their project been completed and produced income as planned. *See City of Austin v. Teague*, 570 S.W.2d 389, 395 (Tex. 1978) (citing *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097 (Tex. 1938)) (awarding lost income as compensation for temporary regulatory taking when losses were shown by competent evidence and with reasonable certainty).  Lost profits can generally be shown with reasonable certainty with simple proof of profitability of a similar business operated by common owners. *See, e.g., Mason and Dixon Lines, Inc. v. Byrd*, 601 So. 2d 68, 71 (Ala. 1992); *Morgan v. South Cent. Bell Telephone Co.*, 466 So. 2d 107, 116 (Ala. 1985); 26 Am. Jur. Proof of Facts 3d 119 (Originally published in 1994).

Federal courts have recognized that there is no one standard metric for

calculating appropriate compensation in a temporary taking case. See *120 Delaware Ave., LLC v. U.S.*, 95 Fed.Cl. 627 (2010). That is because "the Constitution does not define 'just compensation,' and courts have calculated just compensation in various ways, including but not limited to, fair rental value." *Id*. at 632. *See, e.g., Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1578, 1580-81 (Fed. Cir. 1990) (recognizing fair rental value of the property for the taking period as the most common measure of just compensation at the time) (citing *Calculating Compensation for Temporary Regulatory Takings*, 42 Kan. L.Rev. 201, 205 (1993).

Notably, as the *Teague* court explained, both lost profits and lost rental value are appropriate measures of compensation in the context of a temporary taking. 570 S.W.2d at 394 (citing *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180 (Tex. Civ. App. San Antonio 1964). Courts have repeatedly recognized lost income (i.e. profits) as a valid measure of fair rental value provided that such lost income is based upon competent evidence and with reasonable certainly *See, e.g., Primetime Hospitality, Inc. v. City of Albuquerque*, 146 N.M. 1 (N.M. 2009). However, as explained in *Primetime*, a court may not provide for duplicative recovery by, for example, awarding compensation for *both* lost profits and fair market value. *Id*. at 10 (citing *Wheeler III*, 833 F.2d at 271).

Baldwin County argues that under this Court's precedent in *Wheeler III*,

neither lost rental income nor increased construction costs are compensable under the formula set forth by *Wheeler III*. Doc. 11, pp. 42-43.

Baldwin County's approach inappropriately narrows the holdings of the *Wheeler* opinion. *Wheeler* set forth **an** acceptable formula for restoring lost income, not **the** acceptable formula. The court in *Wheeler III* held that "[i]n the case of a temporary regulatory taking, the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit." *Wheeler III*, 833 F.2d at 271. And under the facts of that case, the Court borrowed a formula from the Eighth Circuit and found that "the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction." *Id*. (citing *Nemmers v. City of Dubuque*, 764 F.2d 502, 505 (8th Cir.1985)). But this Court has never found that the formula used in *Wheeler III* is the only formula appropriate to compensate landowners impacted by a temporary taking. Indeed, this Court's precedent has long focused on restoring lost income in the case of a temporary taking. *A.A. Profiles*, 253 F.3d at 584 ("Lost income was a proper measure of compensation in *Wheeler* because the affected property owners retained their parcel and were capable of proceeding with their development plans at the point we declared a taking had occurred and enjoined the

enforcement of the offending ordinance.").

While the formula employed in *Wheeler III* is one way to accomplish that objective, it is certainly not the *only* appropriate method. No precedent, nor the text of the Fifth Amendment says that it is. Indeed, the source of this formula, the *Nemmers* case from the Eighth Circuit, did not cite any rationale for the exclusivity of the formula; rather it only approved of the formula that the plaintiff had used at the trial court. 764 F.2d at 505.

In cases like this, lost net income on the rental of real estate, is tantamount to "fair rental value." *See, e.g., United States v. 37.15 Acres of Land*, 77 F.Supp. 798, 801 (D. Cal. 1948) (awarding, in a case regarding the United States' temporary total physical taking of an operating hotel, damages based on the record of the hotel's earnings, with adjustments based on market conditions). This rationale is consistent with considerable precedent that "the proper measure of compensation is the rental that probably could have been obtained" during the period of the temporary taking. *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S. Ct. 1434, 1438, 93 L. Ed. 1765 (1949); *United States v. General Motors Corporation*, 323 U.S. 373, 382 (1945) (concluding, in case concerning the seizure of a warehouse, that the proper measure of damages is "what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier"); *see also* 2 Dan B. Dobbs,

*Dobbs Law of Remedies* § 6.9(2), at 182 (2d ed. 1993) ("Under traditional rules of compensation for takings of property, if the property was taken completely for a period of time, rental value for that period was the appropriate measure.").

Conversely, cases where courts have disallowed lost profits in favor of "rental value" are instructive. For example, in *Pettro v. U.S.*, 47 Fed. Cl. 136 (2000), the court found that an owner of a sand and gravel pit could not recover lost profits as a measure of compensation because no materials were actually removed from the land during the period of a temporary taking, so the possibility of a "double recovery" existed. *Id.* at 151-52.

Ultimately, this "situation is apt for the oft-quoted remark of Mr. Justice Holmes, "'the question is, What has the owner lost? Not, What has the taker gained?'" *Kimball Laundry*, 338 U.S. at 13 (citation omitted). Here the answer is simple. Breezy Shores lost three years of rental income.

Breezy Shores presented substantial evidence of its lost rental income on its short-term rental project, primarily based on the rental income of a similar project developed by the same principals next door. It is telling that the County has not challenged that methodology other than by saying that it did not follow the formula used in *Wheeler*. Indeed, lost profits can generally be shown with reasonable certainty with simple proof of profitability of a similar business operated by common

owners.

The goal of this Court's takings jurisprudence is to restore lost income, and there is no better way to do than an award of lost rental income based on the extremely similar precedent of a short term rental project. This award is not duplicative, is justified by an accepted methodology for restoring lost rental income, and is fully consistent with this Court's precedent.

With respect to increased construction costs, Breezy Shores presented substantial evidence from Mike Bordelon and Steve Jones. Their testimony showed that construction costs had increased by an amount between $699,118.44 and $780,008.44. (Appendix Vol. I at p. 618-19 & 654). However, the trial court reduced the amount awarded because the amount specifically disclosed by Breezy Shores and Bordelon before trial was only $128,308.00. (Appendix Vol. II at p. 4314). As a result, the trial court, relying on Fed. R. Civ. P. 37(c)(1), excluded evidence of the increase above $138,308.00 but allowed that amount of proved damages to stand.

Baldwin County now challenges that evidence because Breezy Shores failed to introduce sufficient evidence to support that lower figure, did not lay a proper foundation to support any of the opinions rendered, and "it was clear from the testimony that these opinions were based at least in part on hearsay and were therefore inadmissible." (Doc. 11, pp. 55-56). The County does not bother to explain

54

how a proper foundation was missing, or which parts of whose opinions were based on inadmissible hearsay. Importantly, at trial the County raised no objection to Jones' testimony beyond that it was not timely disclosed. (Appendix Vol. I p. 529-30). Even if an objection was made to this testimony, that objection would have been without merit because Jones, as a building contractor, was competent to give lay opinion testimony regarding the increase in construction costs based on knowledge he gained from building houses and duplexes in Fort Morgan and his testimony in this was based on data (actual numbers and easy formulaic calculations), not speculation or unwarranted assumptions. *Compare United States v. Musselwhite*, 709 Fed.Appx. 958, 972 (11th Cir. 2017) with *United States v. An Easement and Right-of-Way Over 6.09 Acres of Land, More or Less, in Madison County, Alabama,* 140 F.Supp.3d 1218, 1240-43 (N.D. Ala. 2015). In short, the trial court properly awarded lost income and increased construction costs in a manner fully consistent with this Court's precedent.

## IV.    MIKE BORDELON HAS INDIVIDUAL STANDING

Baldwin County contends that Mike Bordelon lacks standing to bring this case as an individual because he has no ownership in the property itself, nor does he have ownership in Breezy Shores, LLC, which owns the real property at issue. The County also argues, relying on *Tokyo Gwinnett, LLC v. Gwinnet County, Georgia*,

55

940 F. 3d 1254, 1262, n. 2 (11th Cir. 2019) (citations omitted), that an obligation to pay for attorneys' *alone* is insufficient to create Article III standing.

Breezy Shores, LLC is the owner of the real property at issue. (Appendix Vol. I, p. 65). Mr. Bordelon's self-directed IRA, for which he is both beneficiary and trustee, is a 50% owner of Breezy Shores, LLC. (Appendix Vol. I, pp. 571; 685). In his role as trustee for that IRA, he is entitled to bring suit in his own name to the same extent as the IRA as a member of Breezy Shores, LLC would be, as recognized in *FBO David Sweet IRA v. Taylor*, 4 F. Supp. 3d 1282, 1285 (M.D. Ala. 2014)

Mr. Bordelon has been personally involved in managing the development of the Breezy Shores project and has been personally responsible for attorneys' fees incurred prior to litigation, as well as the costs of litigation. (Appendix Vol. I at p. 571, 21-25; p. 572, 1-4; p. 685, 1-20). As discussed *infra* in Section II, the property interest that was taken by the County in this case was primarily the rental income that the members of Breezy Shores, including Mr. Bordelon through his self-directed IRA, would have derived from its operation. Mr. Bordelon's loss of rental income, incurred legal costs, and management of the Breezy Shores project all support the district court's finding that he has personal standing in this case. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1329-30 (Fed. Cir. 2003).

## **CONCLUSION**

Breezy Shores, LLC and Mike Bordelon respectfully request that this Court affirm the decision of the district court.

Respectfully submitted,

*/s/ Kristopher O. Anderson*
KRISTOPHER O. ANDERSON


*/s/ John Parker Yates*
JOHN PARKER YATES

YATES ANDERSON LLC
4851 Wharf Parkway, Suite D-230
Orange Beach, AL 36561
Telephone (251) 500-4853
E-mail: parker@yatesanderson.com
E-mail: kris@yatesanderson.com


*/s/ Jonathan M. Houghton*
JONATHAN M. HOUGHTON
KATHRYN D. VALOIS

Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Email: JHoughton@pacificlegal.com
Email: KValois@pacificlegal.com

*Attorneys for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document complies with the font and word limitations set forth in the Alabama Rules of Appellate Procedure.  The text in this document is Times New Roman, font 14.  The text contains 12,991 words.

*/s/ Kristopher O. Anderson*
KRISTOPHER O. ANDERSON

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that copies of the foregoing have been furnished electronically on this 5th day of April 2023 to the following:

Jamie Helen Kidd Frawley
Haley Lyckman
WEBB MCNEILL WALKER P.C.
One Commerce St., Ste. 700
Montgomery, AL  36104
jfrawley@wmwfirm.com

*/s/ Kristopher O. Anderson*
KRISTOPHER O. ANDERSON